Next case this morning is 25-1082 Revive Investing et al. v. Armistice Capital Master Fund. Counsel for appellant, would you make your appearance and proceed, please? Counsel for appellant, if you'd make your appearance and proceed, please. Thank you, Your Honor. Dan Doherty for the appellant shareholders. I'd ask for one minute for rebuttal to be reserved. Following the stock market crash in 1929, Congress investigated the causes of the crash, and one of the causes was that there was rampant insider trading by officers, directors, and shareholders of public companies. The 1934 Act was passed in response, and its purpose was announced to provide for the regulation of transactions in the public markets, including those by officers, directors, and principal shareholders of public companies, so as to ensure fair and honest markets. Part of the 1934 Act is Section 16B, which requires officers, directors, and principal shareholders who engage in a purchase-sale-sell-purchase couplet within a period of less than six months to disgorge any profits made back to the issuer. 16B allows the SEC to make exemptions for transactions, quote, not comprehended within the purpose of 16B. It wasn't long after the passage of the 1934 Act that it became apparent that 16B posed a huge impediment to stock compensation for officers and directors. The SEC responded by enacting Rule 16B-3, first in 1935, which I understand was a temporary rule, but later in the 40s and all the way up to today, it is the principal mechanism by which officers and directors are able to acquire stock from the company without having to worry about disgorging any profits. The problem was this, stock compensation normally takes place on a 12-month cycle. Section 16 looks back six months and forward six months, and so it acted as a permanent bar to ever reaping the fruits of stock compensation, which is meant to incentivize management of these corporations. Okay, so it acted almost as a permanent bar. That's the problem 16B-3 was designed to address. And as I understand it, your position is that the SEC exceeded its authority in enacting 16B-3, right? They exceeded their authority in 1996 when they removed requirements that would, in particular, that the shares come out of a shareholder-approved plan. And so it opened the exemption up to directors who were not part of management. In other words, directors by deputization. That's what this case is all about. And to that question, do you think that the SEC would have exceeded its authority if it, as it relates to directors who are humans, as opposed to you're talking about directors by deputization? Directors by deputization, Your Honor. So if they were human, the SEC would have been within the bounds of its authority? I believe they would have been. I mean, it's a question, but we're not questioning that aspect of the rule. Well, I mean, we're talking about what are the bounds of what the SEC can do. Well, if most of your arguments would be equally applicable to the SEC's authority as it relates to humans and directors by deputization, then why isn't that a concern? I mean, because one would have to know how far your argument goes, right? I think the SEC can make rational distinctions between directors who are managerial directors, I'll call them, human directors, versus shareholder directors. For one thing, scale is important. We have in our reply brief a report by F.W. Cook that says that for companies the size of A2, the number of shares granted on an annual basis to the whole group of management is less than 2% of the outstanding shares. When you're talking about an institutional investor who's a director by deputization, the scale goes way up. In this case, we're talking about an acquisition of 10 million shares at a time when the company only had 21 million shares outstanding. Well, counsel, you just said that you believe the SEC can make a rational distinction between directors who are human versus directors who are directors by deputization. Can they not then make a rational decision that they don't want to treat those differently? Well, they could. Isn't that what they did? Oh, well, I don't think they did. I think it was inadvertent, frankly, because there's nothing in the releases that ever speaks in terms of officers and directors as anything other than managerial, you know, members of management. If you look at the language of the releases, it says based on the premise that most, if not all, transactions between the issuer and its officers and directors are for compensatory purposes. That was the premise even in the 96th release. Counsel, so here we have Master Fund, right? That's the director by deputization.  Could an individual be a director by deputization? For example, not that I know of. I suppose they could. Is that the understanding under the rule that the director by deputization is some sort of institutional investor? Is that the universal understanding? Pardon? Is that the understanding? Well, the rules, the releases by the SEC show no consciousness that shareholders are in view at all. The only time they mention shareholders is to say they're not eligible. Well, it was the courts that introduced the notion of director by deputization, not the SEC, correct? They did. It was used in an offensive manner, not a defensive manner at first, right? Correct. Blouby-Lehman was the first case to recognize the concept of director by deputization. It found none in that case. And was given an opportunity to opine on it. The SEC in an amicus brief in the drilling case, wherever that's pronounced, said, yes, that is within the scope of 16b-3, right? They did. And the justifications they used were really two, that the board of directors is an adequate gatekeeper between the insiders and the company, and two, that there's informational parity between these insiders and the company. The problem with the gatekeeper argument is the board of directors is guarding the wrong gate. The gate that the 16b is concerned with is the gate between the insiders and the public markets. State law already provides provisions for protecting the issuer from, you know, fraud by its own directors. In terms of informational parity, the result of this is that if a shareholder by director, a director by deputization, who's a shareholder who has a deputy on the board, feeding it information to influence its investment policy in the issuer, has access to the exemption, but a shareholder with just as many shares who has no deputy and no access to inside information cannot access the exemption. It's backwards. And it's backwards because I don't believe the, back to my, the dryling cases, the SEC's justification. Look, if informational parity is a ticket into the exemption, why is it informational inferiority? You know, the shareholder without a deputy cannot access the exemption. That's just not reasonable. It's not a reasonable outcome. Could I just, counsel, could I just, this is sort of backing up a bit. Okay. But the issue you're presenting for appeal is whether the SEC lacked statutory authority to exempt board-approved transactions between issuers and directors by deputization. That's the issue presented. But in district court, it seems that the thrust of the arguments were more a matter of interpreting the rule, not so much whether the SEC had authority. And so I just have to ask whether this issue has been preserved. Your Honor, we actually mentioned both bases for Did you mention that in your initial motion for, your cross motion for summary judgment? We asked the court, we argued that the exemption was invalid either through interpretation or because it exceeded the authority of the SEC. I'll grant you, we leaned on the interpretation fork at the district court. But the arguments are largely the same, whether you're arguing against that it's a bad interpretation or that it exceeds the authority. It's the irrationality of the result. If you look at the arguments in our district court brief, they're basically very much like the ones here. Counsel, if, let me ask you this. If there was not an overturning of the Chevron deference, would we even be here? Isn't that the crux of this? Is now we need to take another view and determine for We might be here because the cases that, you know, the cases that have upheld us so far are not in this district. So yeah, we might be here. But maybe not. It's hard to say. And to that point, do you think it would be appropriate to remand to the district court to let the district court apply, deal with the issue under Loper-Bright? It's possible, Your Honor. I think this court ought to take it up on the merits, though. If Judge Arguello were to rule against us, we'd appeal it back up here, and I'm sure Master Fund would appeal an adverse ruling back up here. So for purposes of judicial economy, I think this court ought to just rule on the merits. Well, on the merits, as I understand it, one of the considerations, maybe the primary consideration, is whether board-approved transactions involving a director by deputization pose an intolerable risk of abuse, right? Isn't that the art stick? I think that's a decent view of the standard, yes. And who has the burden on that? I think the SEC has the burden. Well, you say in your brief we should use the ordinary tools of statutory construction to resolve that issue, but if we're talking about intolerable risk of abuse, I'm not really sure what the ordinary tools of statutory construction would be. Well, I guess you have to. Isn't this kind of laden with factual questions a level of risk? Well, how are we? You're saying we should decide as a matter of judicial economy. How do we make that determination? Well, the SEC is only allowed to make exemptions for transactions not contemplated within the purpose of 16b. What is the purpose being served by applying it to directors by deputization? Well, adopting that interpretive lens and whether within the purposes contemplated by 16b, it seems to me that that leads, and correct me here, for a broad range of discretion by the SEC in determining what would fall within the purposes of 16b. I mean, how precise do they have to be in tracking or relating to the purposes? First question. Second, aren't they allowed some room for being over-inclusive or under-inclusive in determining what would be within the contemplation of 16b? Your Honor, I think Loper Bright addressed this and said that vague terms are not enough, that unless there are explicit terms of discretion such as in the judgment of the agency or as the agency finds or sometimes a statute will tell the agency to define a term, those still are subject to agency discretion, but there's no such terms here. It says you've got words of permission. They may exempt, followed by words of limitation, transactions not contemplated within the purposes of 16b. But it gives the SEC the authority to make that determination, right? Only within the limits Congress set, Your Honor. And those limits would be the purposes of 16b, and then the question is, who's making that determination? I mean, if Loper Bright contemplates, and it speaks in that footnote about one area where there's an explicit designation that you decide this, why is it that this? I think that's because, Your Honor, it is the province of the courts to determine what the law is. This is what Loper Bright was all about. You don't just leave it up to agencies to say what the purpose of 16b is. That is the court's duty to interpret the statute and determine whether the SEC's action is within the bounds set by Congress. Well, that's true, but I won't take time to pull up that language from Loper Bright. But the language, in effect, is there's this range in which Congress has designated somebody to make that determination, i.e., the agency, then the job of the court is to acknowledge that and to police the boundaries of that designation, which would mean that the court is going to have to make a determination within the context of the statute, is this contemplated by 16b or not? Okay, fine, we can do that, but presumably that means there's a whole bunch of stuff that the SEC can regulate where we shouldn't be in a situation where we're saying that it is not within the contemplation of 16b or not. But, Your Honor, when the exemption is modified so as to allow large institutional investors who are privy to inside information access to the exemption and the same shareholder without that not to have access to the exemption, surely you can say that that's irrational. That's just crazy. That's not the way the exemption ought to be, and I think it's this court's job to step up and say that to the SEC. Well, isn't that a different point? It's not the way it should be is one thing. Is that how we view this? Do we decide anew this is not how it should be? Or do we decide whether it was in the context of the framework of their authority? Aren't those two different issues? I don't think so. I think you determined that that kind of outcome was not within the purposes of 16b, which is to prevent this kind of short swing trading. If you use your time, counsel, I'll give you a little time in rebuttal. Thank you, Your Honor. Good morning, and may it please the court. James Tice on behalf of the appellees. This court may affirm the final judgment after a jury verdict on any of three independent grounds, waiver, the merits, or the statutory safe harbor. I'll begin with waiver. Judge Mathison, you're absolutely right that there's a waiver problem here. The summary judgment motion, as you pointed out, focused exclusively on the scope of the rule and the interpretation of the rule, citing our deference. It's about one page long. It does not mention, it does not invoke Chevron. It does not say that the agency exceeded its statutory authority in promulgating the rule. I will grant you that in the response to the summary judgment motion, which is about five pages long, the thrust of that, I think as my friend on the other side agreed, was on the interpretive form of the argument. The SEC got its interpretation wrong under our, and in fact, cites our on the final page of that argument, but has a throwaway line essentially saying, or it also exceeds the authority. But again, that was not the thrust of the argument below. Did the district court speak in its written order to the question of authority? I think there's some ambiguity on that, Your Honor. Well, okay. There may be some ambiguity. But if there's an argument that the district court did pass on it, then we would not be in a range of forfeiture, would we? I agree with that if the district court had clearly ruled on it, Your Honor. But I think what the district court said is that they have asked, you know, the other side has asked us to overrule the SEC's interpretation. And then it cites a few cases, the Dreeling and Roth cases, which deal with both forms of the argument. They deal with the interpretive form of the argument, as well as the excess of authority argument. So I think what she says in the footnote is they're asking me to overrule the SEC's interpretation. That, to me, sounds like the interpretive form. So, you know, I think this is a waiver problem. I think, though, you know, to zero in on the point a little further, this kind of shows why I think forfeiture is generally appropriate. We don't have a ruling below from the district court, as Your Honor noted. We have a footnote that deals with this very briefly. The summary judgment argument was only one page long. It didn't mention this at all. And so you don't have a developed record. You don't have developed arguments below. You also, crucially, don't have the SEC involved in this case. I think you By the way, counsel, did you say anything about scope of authority in your initial motion for summary judgment? It wasn't teed up, Your Honor. I mean, we think the rule is valid. The SEC has said over decades that the rule is valid and applies to directors by deputization. So we had no basis in our summary judgment motion to opine on that. It was incumbent upon my friend on the other side to challenge the SEC's authority if he was so inclined to do that. So you did not raise the question of authority. That was not within the scope of your argument. It was not within the scope of our argument because the way the case was then we should, therefore, the transactions are exempt. So we had no basis to challenge that authority. What's your position on the stipulation at the jury trial on the issue? Yeah. Well, that was, I think that's another good point, Your Honor. I mean, at the jury trial, after this issue had been resolved in our favor, the plaintiff stipulated that if we were, if master fund were deemed director by deputization, that was the end of the case, that we were entitled to the exemption. Was there a reservation or qualification on the stipulation? There was not, Your Honor. When we made certain factual stipulations but wanted to preserve our legal argument, we did so. There was no such reservation here. It was a flat stipulation. If we lose on this issue, their exemption is triggered and the case is over. So I think that is just another independent ground to rule in our favor. But, again, I do think it's prejudicial because the SEC was just not involved. I think if they had clearly challenged the scope of the rule, the SEC may well have gotten involved. Turning to, I'm happy to answer any other questions on that, but turning to the merits, Your Honor, I think there's a few things that are important to emphasize. I think as we've discussed this morning, Congress expressly delegated to the SEC this task of carving out exemptions to the blunt instrument of Section 16. I think that's the way it's been described in the case law. Because it's a blunt instrument that takes the profit out of an entire class of transactions completely, the courts, including the Supreme Court, for example, in the Foremost McKesson case, says that essentially it should be narrowly construed. We don't try to capture every potential, you know, short swing transaction. If there's any ambiguity whatsoever, I think Foremost says it would be inappropriate to impose this harsh rule of liability when there's any ambiguity at all. And in light of that, the SEC has been given very explicit authority to exempt transactions that are not within the purpose of the statute. And I think crucially, for our purposes today, the purpose of the statute is to prevent the unfair use of information. I think that language by itself connotes some measure of discretion in determining what is unfair in light of the SEC's 80 years of experience interpreting the statute. And as the expert agency that is delegated the task of determining what transactions, even though they might literally fall within Section 16 scope, should not lead to liability. If we were to dive into the merits of this, as Mr. Doherty is urging us to do, is it enough for resolution to look at the history of the statute and the rule, the purpose, and so forth? Or would we need more information? In other words, in assessing whether a deputy by deputization exemption poses intolerable risk, how do you make that determination without evidence? Well, Your Honor, I mean, that's a great question. I do think that ultimately this has been a clear delegation to the agency to make those calls. To your point, I'm not even sure how the court is supposed to determine what exemptions should be created, because it's not a delegation to the courts to exempt transactions. It's a delegation to the agency to do so. So I don't actually think it's even an evidentiary question. I think it's a question of, did the SEC act within the scope of its delegated authority? To the Loper-Bright point, Judge Holmes, I think you referenced this language, but in cases like this where the best reading of a statute, this is from Loper-Bright, is that it delegates discretionary authority to an agency. The task of the court is to recognize the constitutional delegations, which no one doubts this one is, fix the boundaries of the delegated authority, and ensure the agency is engaged in reasoned decision-making within that. And I think there's no question that we have that sort of reasoned decision-making here. They disagree. They think it's unreasonable. But I think my friend on the other side also suggested that there might, you know, they have a range of authority. It might be rational to include or exclude certain transactions. So I think it has to be viewed through that lens. Well, through that lens, I mean, you're right. The other side argued vociferously that it was irrational to have directors by deputization given access to that information, and managers don't have that information. Why is that not irrational? Well, it's not irrational for a number of reasons, Your Honor. I mean, I think just to begin, I think my friend on the other side mentioned and certainly conceded in his briefs that he's not even arguing that the rule exceeds the SEC's exemptive authority as it applies to sort of managing directors or human directors. So I think we only really then need to focus on distinctions between human and directors by deputization. So I think – and human's a bit of a misnomer because I think to answer one of your questions, you could have a human director by deputization if they put a deputy on a company's board. But focusing on that sort of dichotomy just for ease of this argument, so I think you really just need to focus on what the differences are. And I don't think there's any real differences that my friend on the other side pointed to. I think the best, the closest difference they've come to of the five or so they mentioned is the fiduciary duty point, which is that a human director has a fiduciary duty. A outside shareholder may or may not have a fiduciary duty, probably does not. But I think what is crucial is that the deputy on the board – and this is what the SEC itself found, this is what the Roth case agreed with – the deputy on the board does have a fiduciary duty. And that fiduciary duty is important in two ways. Number one, it prevents the fiduciary from allowing the outside shareholder to benefit from sort of self-dealing or insider transactions. And number two, it knowingly prevents the outsider from working with the fiduciary in such a way that would harm the company and in that case would make the outside shareholder liable to the beneficiary. This is in the amicus brief, the Roth and Dreeling amicus briefs, I think on page, let's see, 34 and 35 of the third appendix. I think it walks through some of those points. And I think that's really crucial because SEC itself recognized there are backstops here. Section 16 is a blunt instrument. It should be narrowly construed. It's supposed to take out a narrow class of transactions involving essentially market-based transactions on both sides where the risk is intolerably great. But there are other things, other laws, both state and federal, that protect actual insider trading and self-dealing. You have state fiduciary duty laws. And importantly, you have Rule 10b-5, which imposes both civil and criminal liability for insider trading. Let me ask you about a couple of backstops in the rule itself. Sure. Which we're talking about an acquisition from the issuer. It's not a market transaction. It's from the issuer. And an acquisition that the board has to approve.  Or the shareholders. Right. And that is, those are backstops that are supposed to protect against abuse of inside information. How does that work, though? I mean, that goes to the acquisition. But are there any protections about abuse of inside information when it comes to the sale? Because there, we don't, the board doesn't have to approve the sale, right? Correct. Yeah, so, Your Honor, the, I think the way to think about this is that there are two transactions. What the SEC has said is that the initial transaction, the purchase from the board, just doesn't fall within the rule. There's no risk of unfair use of information in that circumstance during that transaction because the information is the same on both sides. So we can just put that sort of transaction aside. The second transaction in the market is the sort of transaction that the SEC was concerned, or Congress was concerned with, with Section 16. And that transaction can be matched against other market transactions that don't have the gatekeeping functions of that first transaction. But I think what the SEC's point was, in this sort of, we can exempt this sort of class of transaction because they don't involve unfair use of information, given that the directors, the board of directors controls the timing of that acquisition. It's not a situation where a director can pop into the market and take advantage of market-based participants. And also because of the fiduciary duty. But on the sales side of the transaction, no board approval for that. No board approval, Your Honor. But that would apply also to directors themselves, right?  If they've had board approval for purchase from the issuer, they don't need board approval for the sale either. So the director and director by deputization would be treated the same? Right. Yes, that's correct, Your Honor. That's true. Again, I think that goes to the point I mentioned earlier, which is that problem that my friend on the other side mentioned would apply to both human directors and directors by deputization. So it's not a reason to hold that this rule is irrational with respect to directors by deputization. And what the SEC said on that in particular, and again, the Roth and Drehling, or Dryling, I'm not sure how to say it either, go into this in some detail, is that there are both those state and federal backstops we're talking about. You're talking about 10B-5 on the federal front? That's right. Because what I want to understand is, I understand how the timing issue would sort of mitigate against one unfairly using the information in the state and federal front. That really relates just to the purchase, right? Because the insider is still going to have information that the market doesn't have when they sell, right? Not usually, Your Honor, and not in this case. Perhaps not ever. Because in this situation, for example, there was a purchase in October 2019, and about five months later in March there was a sale. But the purchase happened, you know, according to the terms of the agreement at that time. The sale five months later occurred only after, first, the COVID pandemic started rearing its ugly head, and number two, that good news about the company became public knowledge, which is that a test was going to have exclusive rights through this company. And that caused the share price to rise. At that point, there was also informational parity during the sale. So that's often going to be the case as well. This is not a case where, for example, the director purchased, the outside director, the shareholder purchased stock from the general public when it was very cheap, knowing that they were going to get a, you know, this special exclusive marketing arrangement. That would be the sort of unfair, in-and-out, quick market transactions that Section 16 was designed to prevent. That's not what's going on here. I think one other, I think. Is it something that could go on here? I mean, what I'm trying to get at is, because we're talking about the rule, we're not talking about what happened in this particular case. Of course, of course. I was just trying to come back. I'm just trying to understand the informational parity issue. Why wouldn't the director necessarily be at an advantage vis-a-vis the market when they go into the market and have information? And let's assume, again, not talking five months down the road, let's assume I purchased the shares from the company as a director by deputization or a managing director, for that matter, and I immediately turn around thinking that I have a sense from the information I have that, you know, things are either going to go up or go down, and nobody else in the market has that. Why isn't that a conceivable possibility? Well, again, I don't think it is the sort of possibility that the statute is concerned with. There are other statutes that deal with insider trading, with actual use of insider information. Here, there was two transactions. I mean, in general, there's going to be two transactions with equal market information, a purchase between equal parties and then a sale between equal parties, too, because at that point, again, you're only selling because the information is now known to the market. And so, again, I just don't think it's just this class of transactions the SEC determined in its expert judgment does not fall within the scope of the rule. Just to follow up on Chief Judge Holmes, would the situation be different? Would there be other protections? I understand the underlying facts in this case. The information went public, and then there was the public sale. Would it be different if the public sale happened before the information became public? And are there other protections for that?  So I think what the SEC has said about that is, yes, there are other protections. There's self-dealing restrictions through State law, and there's insider trading protections through Federal law. But I think one other thing the SEC has emphasized over and over again is, again, because Section 16 is this blunt instrument, and it imposes liability without fault, it's both under- and over-inclusive, that it's not supposed to prevent any possibility of speculative abuse. Only intolerable risks of speculative abuse. Not any use of information, but unfair use of information. So, again, I think the SEC was well within its discretion to say this sort of class of transaction, for various reasons, is not the sort of transaction we're worried about and we're going to exempt. I know I'm out of time. I just wanted to mention one final point on the safe harbor, just because I think I'd be remiss if I didn't mention it. I just think that is another way to resolve this case. It's very straightforward. We invoked this exemption in our March 2020 filing. That was Exhibit 40. In the docket below, filed a sale of the shares in March, and at that time noted that Master Fund was a director and said that the transactions in question were exempt. There's testimony about this at ECF 179, pages 288 and following. I think if there's any doubt about any of these other issues, this clearly falls within the safe harbor. I don't know what it would mean to rely on a rule in good faith if it were not invoking it at the time of the supposedly liability-creating event, before there was a demand letter, and before there was any litigation. Thank you very much. All right. Thank you, counsel. Two minutes. Counsel. On that last point, they claimed to be a director by deputization at the time of the sale, when they needed the exemption. At the time of the purchase, they claimed they were non-exempt purchases on their public form fours. So the reliance under 23A reliance is simply not attenable. Read Green v. Dietz. The court there established a but-for test for 23A, that the transaction would not have taken place. That means the purchase transaction in this case, but for the reliance on the  I'd like to say something about Judge Mathison's questions about the follow-up sale. Yeah, when you grant an exemption, what is happening is you're giving permission to sell. If you're not going to sell, the exemption is irrelevant. You don't need an exemption if you're not going to sell. All right? So to just look at the relationship between the issuer and the insider at the time of the acquisition is incomplete. That's not the purpose of 16B. The purpose is to keep them from reselling them within six months, which is what happened in this case. And it happened within an hour of the press release that disclosed this. Market shoots up. They dump all their shares in one single day. Okay? Now, can we prove that there's insider information? No, because we didn't need to. But it's fair to say that the market thought more of this COVID test announcement than Masterfund, who had a director on the board. You know, maybe he didn't believe he had legs. This price increase. And so they jump on it, and they take advantage of the jump. The public thinks it's great. Masterfund, not so much. Why would you be selling everything you got in one day? On the jury instructions, we made those stipulations for the purpose of narrowing what the jury had to determine. That was not a concession of the legal issue in this case, so I reject that. On narrow construction, defendants love to cite the court saying that the 16B should be narrowly construed. But they don't get it right. What the Supreme Court says is they're not going to – Finish your thought, counsel. I gave you two minutes. What the Supreme Court says is we're not going to go outside the bounds of the language of the statute. For example, in Reliance Electric, the plaintiff wanted to match transactions more than six months apart based on the fact that they were planned within six months. Supreme Court said, no, that's outside the statute. This is a remedial statute, so we're not going to give it this broad, wooly construction. But when transactions meet the criteria 16B, courts have insisted on vigorous enforcement. Okay. Case is submitted. Thank you, Your Honor. Thank you, counsel. Thank you for a fine argument, sir. Thank you.